IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION


LINDA J. REAGAN,                              )
                                             )
v.                                            )        No. 2:11-0061
                                             )
CAROLYN W. COLVIN,                            )
      Acting Commissioner of                )
      Social Security[1]                    )


To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), as provided by the Social Security Act.

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff is not disabled under the Act is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for "judgment on the pleadings" (Docket Entry No. 12) should be DENIED.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for former Commissioner Michael J. Astrue as the defendant in this suit.

# I. INTRODUCTION

On January 8, 2008, the plaintiff protectively filed for SSI and DIB, alleging a disability onset date of December 20, 2007, due to a seizure disorder.[2] (Tr. 96-103, 111, 117, 152.) Her applications were denied initially and upon reconsideration. (Tr. 46-53, 58-61.) The plaintiff appeared and testified at a hearing before Administrative Law Judge George L. Evans, III ("ALJ") on January 20, 2010 (tr. 31-45), and on March 11, 2010, the ALJ entered an unfavorable decision. (Tr. 23-30.) On April 8, 2011, the Appeals Council denied the plaintiff's request for review of the hearing decision, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-4.)

# II. BACKGROUND

The plaintiff was born on January 21, 1966, and she was 41 years old as of her alleged disability onset date. (Tr. 111.) She has a tenth-grade education, obtained a GED, and has worked as an office manager, clerk, cashier, and house cleaner. (Tr. 34, 36-38, 118-19, 125-35, 150, 184-91.) She is divorced and lives with her father and two children. (Tr. 34-35, 97.)

## A. Chronological Background: Procedural Developments and Medical Records

On February 10, 2005, the plaintiff presented to Volunteer Behavioral Health Care System ("Volunteer") following an attempted suicide and psychiatric hospitalization. (Tr. 246.) She reported having had a mood disorder since 2001, depression for the past 2-3 years, and her first panic attack one year earlier. *Id.* She explained that her symptoms became worse in the previous year as

---

[2] In her SSI application, the plaintiff alleged a disability onset date of January 1, 2001. (Tr. 100.) It does not appear that this discrepancy is addressed elsewhere in the record.

she went through a divorce and that she was addicted to pain medications. *Id.* She was diagnosed with a mood disorder, not otherwise specified ("NOS"), and assigned a Global Assessment of Functioning ("GAF") score of 49.[3] (Tr. 249.) A Tennessee Clinically Related Group ("CRG") form completed by a Volunteer staff member on February 10, 2005, indicated that the plaintiff had marked limitations in the areas of the activities of daily living, adaptation to change, and concentration, task performance, and pace as well as a moderate limitation in interpersonal functioning. (Tr. 232-33.) The plaintiff had some sporadic contact with Volunteer in 2005 (tr. 235-45), but she was discharged on March 17, 2006, after failing to attend appointments. (Tr. 250.) At the time of her discharge, she was diagnosed with "bipolar I disorder, most recent episode mixed, severe without psychotic features," and assigned a GAF score of 52.[4] *Id.*

On July 2, 2006, the plaintiff presented to the Cumberland Medical Center emergency room and reported that she had fallen and hit the back of her head after having a seizure. (Tr. 297.) She told the emergency room physician that her last seizure had been three years earlier and that she had stopped taking anti-seizure medication one year earlier. *Id.* She had additional seizures in 2006 (tr. 259-60, 304-08), including one on December 19, 2006, during which she fell, displacing her knee cap and necessitating surgery. (Tr. 340-47, 358-59, 366, 463-69.) During this time, the plaintiff also complained of frequent, severe headaches. (Tr. 318, 320, 323, 331.) CT scans of her brain in 2006

---

[3] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

[4] A GAF score between 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

were normal. (Tr. 335, 360, 471-72.) At the time, she was taking Dilantin for seizures and Cymbalta for depression. (Tr. 460, 464.)

From December 7, 2007, to April 14, 2008, Dr. Steven Pribanich of the Crossville Medical Group treated the plaintiff for a number of ailments, including fatigue, weakness, weight gain, hyperthyroidism, hypercholesterol, somnambulism, somniloquence, insomnia, depression, and seizure disorder. (Tr. 482-88, 492-95, 505-16.) In December 2007, Dr. Pribanich discontinued Cymbalta, prescribed Lexapro for depression, and referred the plaintiff to Dr. Stephen Chung, a neurologist with the Crossville Medical Group.[5] (Tr. 483, 488.) Dr. Chung examined the plaintiff on January 2, 2008, and noted that she had been having "generalized convulsive seizure activity since 2001" but that an electroencephalogram ("EEG") performed in May 2001 had been normal. (Tr. 489.) He also noted that the seizure in 2001 had been "attributed to Wellbutrin" and that, since then, the plaintiff had experienced "a total of four or five more seizures, [t]wo of which were associated with Tramadol."[6] *Id.* The plaintiff reported that she had been taking Depakote since November 2006, but that her dosage had been reduced due to worsening cognitive functioning, which had resulted in her losing a job.[7] *Id.* She also reported that she had changed from Depakote to Depakene due to cost.[8] *Id.* Dr. Chung diagnosed her with "[i]diopathic partial epilepsy with

---

[5] Dr. Pribanich also referred the plaintiff to Dr. Rabih Hijazi for treatment of her thyroid condition. (Tr. 252-58, 483, 486.)

[6] Wellbutrin is an antidepressant and Tramadol is an analgesic for moderate to severe pain. Saunders Pharmaceutical Word Book 715, 763 (2009) ("Saunders").

[7] Depakote is an anticonvulsant used to treat seizures, manic episodes of bipolar disorder, and as a migraine headache prophylaxis. Saunders at 210.

[8] Depakene, or valproic acid, is an anticonvulsant used to treat seizures. Saunders at 209.

secondary generalization," prescribed an increased dosage of Depakene, and ordered an EEG. (Tr. 491.) The January 8, 2008 EEG was "abnormal . . . with epileptiform discharges noted over the left temporal region." (Tr. 400, 404-06.) On January 11, 2008, Dr. Pribanich noted that the plaintiff's depression and insomnia had improved. (Tr. 494.)

Dr. Stephen Burge, a nonexamining DDS consultative physician, completed a physical Residual Functional Capacity ("RFC") assessment on March 24, 2008. (Tr. 496-500.) Dr. Burge opined that the plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl but that she could never climb ladders, ropes, or scaffolds. (Tr. 498.) He found no exertional, manipulative, visual, or communicative limitations and opined that the plaintiff had no environmental limitations except that she should avoid concentrated exposure to hazards such as heights and machinery due to her history of seizures. (Tr. 497-99.) He noted, however, that her seizure disorder was "not well documented." (Tr. 497.)

The plaintiff returned to Dr. Pribanich on April 14, 2008, and he diagnosed her with generalized seizures and depression. (Tr. 515-16.) During a physical examination, he observed that she was well developed, well nourished, and alert and oriented with mild lethargy and normal balance, gait, and muscle tone. *Id.* The plaintiff had paperwork related to her disability claim for Dr. Pribanich, and, in a treatment note, he indicated that she was "unable to drive. She has 2 seizures weekly while on Rx(s). She has STM and IQ loss. She sleep [*sic*] 2 hours in the afternoon due to excessive fatigue. House work is minimal and light duty." (Tr. 515.)

On two forms, a Medical Opinion Form and a Treating Relationship Inquiry form (tr. 517-23), Dr. Pribanich opined that the plaintiff was unable to complete a full work week because she experienced two seizures a week while taking prescription medicine and that the seizures resulted

in memory loss and confusion. (Tr. 517, 520-21.) He opined that she had poor ability to perform the activities of daily living; poor social functioning; poor ability to relate predictably in social situations; poor concentration, persistence, and pace; poor ability to adapt to stressful circumstances; fair ability to behave in an emotionally stable manner; fair ability to understand, remember, and carry out simple instructions; and no ability to understand, remember, and carry out detailed or complex instructions. (Tr. 518, 522.) He added that the plaintiff's medications affected her level of fatigue, alertness, concentration, coordination, and memory and that she would have difficulties with cognitive functioning. (Tr. 519, 522.)

Dr. Pribanich found that the plaintiff's seizures caused her to become hypoxic with alterations of awareness, loss of consciousness, convulsions, transient postictal manifestations of unconventional behavior, severe fatigue, and self-harm as evidenced by past injuries incurred during seizures. (Tr. 521.) He also opined that she would experience daytime mental functioning deficits including fatigue, disorientation to time and place, memory impairment, perceptual or thinking disturbances, mood disturbances, and loss of 15 IQ points. *Id.* He opined that the plaintiff would experience marked limitation of physical activity due to fatigue, would need to take naps for 1.5-2 hours a day, would need to take an hour break for every three hours of work, would require two hours of recovery time after a seizure, and would need to avoid even mild forms of stress to avoid seizure activity. (Tr. 522.) Finally, he opined that the plaintiff could never crawl or walk on uneven surfaces but could occasionally reach above her shoulders and frequently use her hands for fine manipulation. (Tr. 523.)

On April 14, 2008, Dr. Chung completed a Treating Relationship Inquiry form and opined that the plaintiff would be unable to work a full work week due to temporal lobe epilepsy and grand

mal epilepsy, noting that she experienced two seizures a week while on medication. (Tr. 525.) He opined that her seizures would significantly interfere with her ability to concentrate and remember simple instructions and would result in alterations of awareness, loss of consciousness, convulsions, memory impairment, and potential self-harm. (Tr. 526.) He also opined that she would experience deficiencies of concentration, persistence, or pace as well as repeated episodes of decompensation and would need to avoid even mild forms of stress. (Tr. 527.) He found that she would not need a nap during the day but would need up to eight hours of recovery time following a seizure and would miss more than 2-3 days of work per month. *Id.* Dr. Chung also opined that, in an eight-hour workday, the plaintiff could sit for eight hours, stand for one hour, and walk for one hour and that she could lift/carry 1-5 pounds occasionally but never more than six pounds, frequently use her hands for fine manipulation, occasionally bend, stoop, squat, kneel, crawl, and walk on uneven surfaces, but never climb stairs or reach above her shoulders. (Tr. 528-29.)

In a Seizure Report completed on May 5, 2008, Dr. Chung indicated that neither he nor his staff had ever witnessed the plaintiff having a seizure but that she had experienced four general tonic clonic seizures[9] in the past year even though she was taking Depakene as prescribed. (Tr. 531-32.) He reported that her first recorded seizure was in 2001 and her most recent in April 2007, but he explained that he had only seen the plaintiff on two occasions. (Tr. 531-32.)

On May 27, 2008, the plaintiff presented to Dr. Chung and complained of having daily headaches, insomnia, and "visual aura with flashing that last[ed] for about five seconds" every 2-3

---

[9] Tonic clonic (or tonoclonic) describes "a spasm or seizure consisting of a convulsive twitching of the muscles." Dorland's Illustrated Medical Dictionary 1920 (30th ed. 2003).

days.  (Tr. 709.)  Dr. Chung recommended a CT scan,[10] prescribed Dilantin, adjusted her other medications, and encouraged her to keep a headache diary.  (Tr. 710.)  When the plaintiff returned to Dr. Chung in July 2008, her headache diary showed "at least four to five headaches per week" with accompanying nausea, dizziness, and photosensitivity.  (Tr. 705.)

On July 23, 2008, Jerell Killian, M.S., a DDS psychological consultant, performed a clinical interview and mental status examination.  (Tr. 535-37.)  The plaintiff told Mr. Killian that she had worked at approximately fifty jobs but that she had only been fired one time and had "quit all the rest."[11]  (Tr. 535.)  She explained that her psychological problems started when she was 35 years old "when her daughter accused her step-father of molesting her."  *Id.*  She said that she had attempted suicide twice, resulting in psychiatric hospitalizations, and had received outpatient treatment but was no longer receiving "formal mental health services."  *Id.*  She characterized herself as "high energy" and "high strung" and related that she had "nervous energy" and trouble sleeping.  (Tr. 536.)  However, she said that, at other times, she was "lethargic with low drive and motivation" and that "she would quit jobs because she wouldn't get out of bed to go to work."  *Id.*  The plaintiff told Mr. Killian that she experienced "difficulties for much of her life with relationships" and related that she had been divorced four times, "which she admitted may have . . . been at least partially due to her psychological problems."  *Id.*

She reported that she performed "limited homemaking activities," "sometimes" emailed people, and could use a cell phone but that she had an "ongoing struggle . . . keep[ing] up with

---

[10] It is unclear from the record whether this CT scan was ever performed.

[11] Mr. Killian also noted that the plaintiff said that she was working part-time "at present" cleaning homes.  (Tr. 535.)  However, in her testimony before the ALJ, the plaintiff explained that she cleaned one home in 2008 and only earned approximately $130.00 that year.  (Tr. 36.)

routines such as taking medication and paying bills." (Tr. 537.) She said that she did not drive because of the risk of having a seizure but that she was able to go grocery shopping if someone took her to the store. *Id.*

Mr. Killian observed that the plaintiff "exhibited no signs of serious distress," was "friendly, polite, and spontaneous," and "participated normally in casual conversation." (Tr. 536.) Additionally, he observed "no blocked or interrupted thoughts and no psychomotor abnormalities such as tremor, agitation, or slowed responses," and he found "no hints of aberrant thinking." *Id.* He found her to be alert and well oriented. *Id.* He diagnosed bipolar disorder, NOS, with borderline personality traits and opined that "[s]he exhibited no significant limitations in cognitive functioning" but that "[t]he major issue is adaptability which would seem to be moderately to severely compromised." (Tr. 537.)

On August 9, 2008, Dr. Reeta Misra, a DDS nonexamining consultative physician, completed a physical RFC assessment. (Tr. 655-62.) Dr. Misra opined that the plaintiff had no exertional, postural, manipulative, visual, or communicative limitations and that her only environmental limitation was the need to avoid all exposure to hazards such as machinery and heights due to seizures. (Tr. 656-59.)

On October 9, 2008, Dr. George Livingston, Ph.D., a nonexamining DDS consultant, completed a mental RFC assessment and PRT. (Tr. 667-84.) In the PRT, Dr. Livingston found that the plaintiff had a mood disorder, NOS, that caused her moderate restrictions in the areas of the activities of daily living, maintaining social functioning, and maintaining concentration, persistence,

and pace.[12] (Tr. 667, 670, 677.) He explained that the plaintiff had a "mental impairment involving a mood [disorder] that is more than non-severe but that does not meet or equal any listing." (Tr. 679.) He opined that the opinions of Mr. Killian, Dr. Pribanich, and Dr. Chung "appear[ed] overly restrictive due to confounding of mental and physical limitations." *Id.* In the mental RFC assessment, Dr. Livingston opined that the plaintiff had moderate limitations in a number of areas related to understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (Tr. 681-82.) He explained that her social functioning and adaptation were "adequate" and that she could perform "simple and low level detailed tasks w/ normal supervision." (Tr. 683.)

The plaintiff continued her treatment with Dr. Chung from September 2008, until November 2009. (Tr. 697-704, 711-15, 718-39, 754-58.) She often complained of frequent, severe headaches and visual aura. (Tr. 700-03.) In October 2008, she reported that she had not had any more seizures but had experienced 4-5 auras, which manifested as "flashing of light" and "[took] her breath away," causing disorientation and headaches. (Tr. 700.) Dr. Chung prescribed carbamazepine,[13] continued to prescribe Dilantin, and observed that her headaches were "related to seizures." (Tr. 700-03.) On November 17, 2008, the plaintiff's seizure diary showed "a total of 10 partial seizures since October 3rd, which she describe[d] as 'auras.'" (Tr. 697.) Her headache diary showed seventeen headaches, ranging from mild to severe, during the same time period. *Id.* Dr. Chung noted that the plaintiff's "last generalized convulsive seizure activity was more than a year ago" and that "[o]verall, her seizures and headache[s] have improved with carbamazepine, but she complains of having

---

[12] Dr. Livingston found that there was insufficient evidence to determine the number of episodes of decompensation that the plaintiff experienced. (Tr. 677.)

[13] Carbamazepine is used as an anticonvulsant for seizures, as an analgesic for neuralgia, and as an antipsychotic for manic episodes of bipolar disorder. Saunders at 129.

daytime fatigue and excessive daytime sleepiness." *Id.* He diagnosed her with "[p]artial epilepsy with secondary generalization" and observed that her symptoms of sleepiness and fatigue were consistent with possible obstructive sleep apnea. (Tr. 698.)

The plaintiff underwent knee surgery in December 2008. (Tr. 686-95, 742-51.) Due to the plaintiff's seizure history, her orthopaedic surgeon, Dr. Craig Beeler, required clearance from Dr. Chung before performing the surgery. (Tr. 686-87.) In a December 3, 2008 note, Dr. Beeler indicated that Dr. Chung had cleared the plaintiff for surgery and that Dr. Chung had said that "her seizures are just very small and are not generalized tonoclonic." (Tr. 746.)

The plaintiff returned to Dr. Chung on December 17, 2008, and reported that she had a seizure that lasted for one minute and was having such seizures twice a week. (Tr. 718.) Dr. Chung noted that carbamazepine had obtained "fair results" but also noted that there had been "no change in seizure pattern." (Tr. 718, 720.) He observed that she was compliant with medication and was able to perform the activities of daily living but was "[h]aving some difficulty with ambulation." (Tr. 720.) Dr. Chung also addressed the plaintiff's symptoms of fatigue and sleepiness, diagnosing her with hypersomnia with sleep apnea and scheduling a CPAP titration study. *Id.*

The plaintiff continued to see Dr. Chung on an approximately bimonthly basis throughout 2009. (Tr. 721-39, 754-56.) She generally reported having 1-2 convulsive seizures a week as well as "visual aura and confusion about 2 times a week." (Tr. 721, 724, 727, 729, 733, 754.) Dr. Chung diagnosed her with "[i]diopathic partial epilepsy with secondary generalization, intractable," obstructive sleep apnea, and migraine headaches. (Tr. 725, 728-29, 731, 733, 735, 756.) He prescribed a number of medications, including Topamax, Dilantin, carbamazepine, Keppra, and

Lexapro.[14]  (Tr. 721-28, 730-31, 735, 737-39, 756.)  The frequency and severity of the plaintiff's headaches improved while taking Topamax, and her sleep apnea improved with CPAP titration. (Tr. 727, 729, 731, 733, 735, 754.)

On October 1, 2009, the plaintiff reported that she had a seizure in which she lost consciousness while mowing her lawn.  (Tr. 733.)  She crashed the lawnmower and sustained a bruise to her chest.  *Id.*  On November 4, 2009, she reported that she had a seizure in which she fell down and was confused for five minutes afterwards.  (Tr. 754.)  She continued to experience visual auras about three times a month that were typically followed by headaches.  *Id.*  Dr. Chung instructed the plaintiff to avoid driving, heights, climbing ladders, using heavy machinery, swimming or bathing by herself, and cooking or being near an open flame.  (Tr. 756.)  He noted, however, that her insomnia was "resolved" and that she had experienced "significant improvement of migraine headaches since starting Topamax," and had not had a severe headache in a "few months" with only "moderate headaches about every 2 weeks."  (Tr. 754.)

### B. Hearing Testimony

At the hearing on January 20, 2010 (tr. 31-45), the plaintiff was represented by counsel, and she testified that she was unable to work due to a seizure disorder, depression, and migraine headaches.  (Tr. 39.)  She testified that she had not worked since her alleged onset date of December 20, 2007, but, when asked whether she cleaned homes on a part-time basis in July 2008, she acknowledged that she had cleaned one home in 2008 and earned approximately $130.00 in

---

[14] Topamax and Keppra are anticonvulsant medications used to treat partial onset and generalized tonic clonic seizures, a variety of psychiatric disorders, and migraine headaches. Saunders at 388, 712.

income that year.[15]  (Tr. 35-36.)  She explained that her doctor recommended that she not "be alone in someone else's home" or drive a car due to her seizure disorder.  (Tr. 36.)  The plaintiff testified that she worked as an office manager from 1995 until 2001 but was fired due to illness.  (Tr. 38.)  She said that she also worked as a clerk and cashier but relayed that the office manager job was "easier," although she said that she "mentally couldn't handle" being an office manager at the present time.  (Tr. 38-39.)

She testified that she has experienced seizures since 2001 and that she has a seizure "every eight or nine days," despite taking medication.  (Tr. 39-40.)  She described her seizures as follows:

> I just stare off and [people are] trying to get my attention, pecking me on the shoulder, calling my name and I don't respond.  I just kind of stare off and then I will go limp, either fall out of the chair or if I'm standing I just kind of faint to the floor. Sometimes I make a moaning sound.  Sometimes I smack my lips or I'll stop breathing.  And then I'll kind of slowly come to and sort of – it takes me a few minutes to realize what happened and then I get a really bad headache.

(Tr. 40.)  She testified that her seizures typically last for 3-4 minutes and that it usually takes 10-15 minutes for her to feel normal following a seizure.  (Tr. 40-41.)  She said that the resulting headache typically lasts for an hour and requires her to lie down.  (Tr. 41.)

The plaintiff related that she has depression and that medication does not fully relieve the symptoms.  (Tr. 41-42.)  She also related that she has problems with her memory and concentration, including difficulty following along while watching television or reading a book.  (Tr. 42.)  She testified that she has sleep apnea but uses a CPAP machine, which she said helps her breathing at night.  (Tr. 42-43.)  She explained, however, that she remains tired during the day and naps approximately one hour a day.  (Tr. 43.)  She testified that she does not often leave her house and

[15] She did not testify, as the defendant recounted, *see* Docket Entry No. 14, at 2, that she cleaned "some" homes in 2008.

that she is able to do "normal chores" such as washing dishes but is unable to operate machinery such as a lawnmower.  (Tr. 43-44.)

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable ruling on March 11, 2010.  (Tr. 23-30.)  Based upon the record, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2.    The claimant has not engaged in substantial gainful activity since December 20,  2007, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

***

3.    The claimant has the following impairments: a seizure disorder, headaches, obstructive sleep apnea and a bipolar disorder (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

***

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant is unable to climb ladders, ropes or scaffolds and must avoid all exposure to hazards such as machinery and heights. The claimant can also perform simple and low-level detailed tasks with normal supervision with adequate social functioning and adaption.

***

6.    The claimant is capable of performing past relevant work as an office manager. This work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

***

7.      The claimant has not been under a disability, as defined in the Social Security Act, from December 20, 2007, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 25-30.)


# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion.  42 U.S.C. § 405(g).  *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010).  The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999).  Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376, 157 L. Ed.2d 333 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most

jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting."  20 C.F.R. § 404.1521(b).  The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment.  42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d)).  The plaintiff may establish that she meets or equals a listed impairment and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988).  The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability.  *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled.  *Id.*  The plaintiff has the burden of proving inability to perform past relevant work or proving that a particular past job should not be considered relevant.  *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by [her] impairments and the fact that [she] is precluded from

performing [her] past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden of production shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). *See also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L. Ed. 2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d

860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

## B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's claim at step four of the five-step process. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since her alleged disability onset date. (Tr. 25.) At step two, the ALJ determined that the plaintiff had the following impairments: a seizure disorder, headaches, obstructive sleep apnea, and bipolar disorder.[16] *Id.* At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 25-27.) At step four, the ALJ determined that the plaintiff was capable of performing her past relevant work as an office manager. (Tr. 29-30.)

## C. The Plaintiff's Assertions of Error

The plaintiff argues that the ALJ erred by failing to give controlling weight to the opinions of Dr. Pribanich and Dr. Chung. Docket Entry No. 13, at 7-9. The plaintiff also argues that the ALJ erred in concluding that her mental impairments did not meet or equal Listing 12.04. *Id.* at 9-10.

---

[16] The ALJ did not specify whether these impairments qualified as severe but, presumably, he would not have proceeded to step three in the five-step process had they not.

**1. The ALJ properly assessed the medical opinion evidence.**

The plaintiff argues that the ALJ erred by not giving controlling weight to the opinions of her treating physicians, Drs. Pribanich and Chung. Docket Entry No. 13, at 7-9.

The Regulations provide that the SSA "will evaluate every medical opinion" that it receives. 20 C.F.R. § 404.1527(c). However, every medical opinion is not treated equally, and the Regulations describe three classifications for acceptable medical opinions: (1) nonexamining sources; (2) nontreating sources; and (3) treating sources. A nonexamining source is "a physician, psychologist, or other acceptable medical source[17] who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." 20 C.F.R. §§ 404.1502, 416.902. A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id.* Finally, the Regulations define a treating source as "[the claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id.* An "ongoing treatment relationship" is a relationship with an "acceptable medical source when the medical evidence establishes that [the claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating source, as compared to the medical opinion of a non-treating source, if the opinion of the

_____

[17] The Regulations define acceptable medical sources as licensed physicians, both medical and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2).[18] *See also Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. 2010); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009). This is commonly known as the treating physician rule. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996).

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in [20 C.F.R. 416.927] . . . .*'" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. 2006) (quoting current 20 C.F.R. § 404.1527(c)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing current 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion

---

[18] Effective March 26, 2012, the numbering for the treating physician rules changed. Section 416.927(d)(2) became section 416.927(c)(2), and the identically worded and interpreted section 404.1527(d)(2) became section 404.1527(c)(2). *See Johnson-Hunt v. Comm'r of Soc. Sec.*, 2012 WL 4039752, at *6 n.6 (6th Cir. Sept. 14, 2012).

and the reasons for that weight." *Id.* If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification.[19] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004).

The ALJ explained his decision to give the opinions of Dr. Pribanich and Dr. Chung little weight, as follows:

> As for the opinion evidence, on April 18, 2008,[20] Steven Pribanich, M.D., the claimant's general practitioner, opined that . . . the claimant had two seizures per week while on medication with no ability to understand, remember or carry out complex or detailed instructions, no ability to perform eight [] hours of work per day and forty hours of work per week and marked limitations of physical activity among other limitations. . . . However, the undersigned gives this opinion little weight as it is simply not supported by the objective medical evidence of record, and Dr. Pribanich's own treatment notes. For example, on April 14, 2008, the date Dr. Pribanich examined the claimant prior to writing his opinion, he found the claimant to be well developed and well nourished with alert cognitive functioning and only mild lethargy. Her coordination was also normal, as was her balance, gait and muscle tone. Further, his note that the claimant was having two seizures per week was completely based upon the claimant's subjective statements on that occasion, and not any objective basis, as the claimant had not previously mentioned any such seizure activity to Dr. Pribanich. . . .

> The undersigned also gives little weight to Dr. Chung's April 14, 2008 opinion that the claimant had two seizures per week, as this was also based solely upon the claimant's subjective statements. Further, there is no objective evidence whatsoever to support Dr. Chung's other suggested physical limitations, such as his statements that the claimant could only stand or walk for one hour each per eight-hour workday. . . . In addition, on May 5, 2008, Dr. Chung noted that neither he nor any other member of his staff had ever witnessed the claimant during a seizure, and the claimant had her last seizure in April 2007, according to Dr. Chung.

(Tr. 28.)

---

[19] The rationale for the "good reasons" requirement is to provide the claimant with a better understanding of the reasoning behind the decision in his case and to ensure that the ALJ properly applied the treating physician rule. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

[20] Both forms completed by Dr. Pribanich are dated April 14, 2008. (Tr. 519, 523.)

The ALJ's assessment of both doctors' opinions satisfies the treating physician rule. The ALJ chose not to give either opinion controlling weight because the opinions were not supported by objective evidence and were inconsistent with the record. In particular, the ALJ found that the physical restrictions suggested by both doctors were inconsistent with their own treatment notes outlining, at most, very minimal physical limitations. For example, as the ALJ observed, on the same day that Dr. Pribanich opined that the plaintiff had marked physical limitations, a physical examination was generally unremarkable. (Tr. 28, 515-23.) When Dr. Chung completed his opinion, he had only seen the plaintiff on two occasions,[21] primarily regarding her seizure disorder. (Tr. 489-91, 532.) On the first occasion, a physical examination and neurological evaluation were both within normal limits. (Tr. 490-91.)

The ALJ also found that both doctors based their opinion that the plaintiff experienced two seizures per week while on medication on the plaintiff's own subjective statements and not on any objective basis. (Tr. 28.) The plaintiff did not begin complaining of twice-a-week seizures until April 14, 2008, the same day that Dr. Pribanich and Dr. Chung completed their assessments. (Tr. 489-93, 505-15.) Dr. Pribanich indicated that he based his conclusion that the plaintiff had seizures twice a week on Dr. Chung's findings as well as the plaintiff's EEG results. (Tr. 520.) In January 2008, an EEG had been "abnormal . . . with epileptiform discharges," but, at a neurological evaluation with Dr. Chung, the plaintiff had reported having only "four or five" seizures since 2001 and indicated that her last seizure had been in 2006. (Tr. 400, 404-06, 489.) In a Seizure Report on April 14, 2008, Dr. Chung relayed that the plaintiff's last seizure had been in April 2007. (Tr. 532.)

---

[21] Dr. Chung indicated that he saw the plaintiff on January 2, 2008, and April 2, 2008. (Tr. 532.) The Court has been unable to locate in the record a treatment note from the latter visit.

The plaintiff later reported having seizures with greater frequency. (Tr. 718-39, 754-56.) However, at the time that Drs. Pribanich and Chung completed their assessments, there is no indication in the record that the plaintiff was experiencing seizures with the frequency reported by these doctors. Consequently, the ALJ was entitled to infer that the doctors based their opinions on the plaintiff's subjective reports and to discount their opinions on this basis.

Ultimately, the ALJ decided to give both doctors' opinion little weight. (Tr. 28.) The ALJ thoroughly explained the weight that he afforded each opinion and the reasons for that weight. There is substantial evidence in the record to support the ALJ's assessment of the medical opinion evidence.

**2. The ALJ properly determined that the plaintiff did not meet or equal Listing 12.04.**

The plaintiff argues that the ALJ improperly determined that she did not meet or equal Listing 12.04. Docket Entry No. 13, at 9-10.

The plaintiff has the burden of proof at step three to demonstrate that she "has or equals an impairment" listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Little v. Astrue*, 2008 WL 3849937, at *4 (E.D. Ky. Aug. 15, 2008) (quoting *Arnold v. Comm'r of Soc. Sec.*, 2000 WL 1909386, at *2 (6th Cir. Dec. 27, 2000)). The plaintiff's impairment must meet all of the listing's specified medical criteria and "[a]n impairment that meets only some of the criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-532 (1990). If the plaintiff demonstrates that her impairment meets or equals a listed impairment, the ALJ must find the plaintiff disabled. *Little*, 2008 WL 3849937, at *4 (quoting *Buress v. Sec'y of Health and Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)).

Listing 12.04B[22] lists the criteria for affective disorders, and, in order to meet the listing, the plaintiff must show that at least two of the following criteria are met:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation; each of extended duration[.]

20 C.F.R. Part 404, Subpart P, App. 1.

The ALJ determined that the plaintiff had mild restriction of activities of daily living, mild difficulties in social functioning, moderate difficulties maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. 26.) Consequently, the ALJ found that the plaintiff failed to establish that her mental impairment was of listing-level severity. (Tr. 26-27.) The plaintiff argues that she has more significant limitations and points to Dr. Pribanich's medical opinion as well as a February 10, 2005, CRG form completed by a Volunteer staff member indicating that she had marked limitations in three relevant categories and a GAF score of 49. Docket Entry No. 13, at 9-10; (tr. 232-34, 249, 518).

Although the plaintiff has been diagnosed with bipolar disorder, she has not shown that this impairment meets or equals Listing 12.04. As the ALJ observed, the plaintiff "sought almost no mental health treatment or counseling." (Tr. 29.) She began treatment with Volunteer following a suicide attempt in 2005; however, she did not continue to pursue treatment and was discharged for failing to attend appointments. (Tr. 237-50.) She has not sought further mental health treatment or

---

[22] Although the ALJ also found that the plaintiff did not satisfy Part C of Listing 12.04 (tr. 26), the plaintiff focuses her argument on the ALJ's finding that she did not meet or equal Part B of the listing. Docket Entry No. 13, at 9-10.

counseling since.[23]  The plaintiff relies on a single CRG assessment completed in 2005; however, this assessment standing alone is insufficient evidence of a disabling mental impairment.  Similarly, the plaintiff's GAF score of 49 in 2005 is "not dispositive of anything in and of itself, but rather only significant to the extent that it elucidates [her] underlying mental issues."  *Oliver v. Comm'r of Soc. Sec.*, 415 Fed. Appx. 681, 684 (6th Cir. Mar. 17, 2011).  *See also Bratton v. Astrue*, 2010 WL 2901856, at *8 (M.D. Tenn. July 19, 2010) (Nixon, J.).

The opinions of the DDS psychological consultants support the ALJ's conclusion that the plaintiff's mental impairment is not disabling.  During a psychological assessment on July 23, 2008, Mr. Killian observed that the plaintiff was well groomed and dressed, alert and oriented, and "friendly, polite, and spontaneous."  (Tr. 535-36.)  He noted that she "exhibited no signs of serious distress," "participated normally in casual conversation," and demonstrated normal thought processes.  (Tr. 536.)  The plaintiff reported that she was working part-time cleaning homes and was able to shop for groceries, email, and use a cell phone.  (Tr. 535, 537.)  She also reported that her condition was "relatively stable" and denied having suicidal ideation.  (Tr. 536.)  Mr. Killian found that she "exhibited no significant limitations in cognitive functioning" but that she had moderate to severe limitations in adaptability.  (Tr. 537.)  In 2008, Dr. Livingston, a DDS nonexamining consultant, completed a mental RFC assessment and PRT, opining that the plaintiff had no more than moderate mental limitations.  (Tr. 677, 681-82.)  The plaintiff argues that Dr. Pribanich's opinion that she has poor mental abilities supports a finding of disability under Listing 12.04.  Docket Entry No. 13, at 10; (tr. 518).  However, as discussed above, the ALJ appropriately determined that

---

[23] The plaintiff continued to be prescribed antidepressant medication by her doctors. (Tr. 225, 483-94, 509-16, 698-706.)

Dr. Pribanich's opinion was not supported by the record and declined to adopt his assessment of the plaintiff's limitations. In sum, the evidence in the record supports the ALJ's conclusion that the plaintiff's mental impairment does not meet or equal Listing 12.04.

## IV. RECOMMENDATION

For the above stated reasons it is recommended that the plaintiff's motion for "judgment on the pleadings" (Docket Entry No. 12) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. See *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge